**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Phoenix Van Buren Partners, LLC, an Arizona limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>Moulding & Millwork, Inc., Pacific, a Washington corporation,<br><br>Defendant. | No. CV 11-01943-PHX-NVW<br><br>**ORDER** |

Before the Court are Plaintiff's motion for summary judgment (Doc. 11) and Defendant's cross-motion for summary judgment (Doc. 17). Having reviewed the briefs, and having heard oral argument, Defendant's motion will be denied and Plaintiff's motion will be granted on Plaintiff's alter ego theory. In light of this disposition, the remainder of both Plaintiff's and Defendant's contentions need not be decided.

**I.   LEGAL STANDARD**

Summary judgment is warranted if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the nonmoving party would bear the burden of persuasion at trial, the moving party may carry its initial burden of production by submitting admissible "evidence negating an

essential element of the nonmoving party's case," or by showing, "after suitable discovery," that the "nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1105–06 (9th Cir. 2000).

When the moving party has carried its burden, the nonmoving party must respond with specific facts, supported by admissible evidence, showing a genuine issue for trial. *See* Fed. R. Civ. P. 56(c). But allegedly disputed facts must be material — the existence of only "*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).

Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, the nonmoving party's properly presented evidence is presumed to be true and all inferences from the evidence are drawn in the light most favorable to that party. *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1289 (9th Cir. 1987).

## II. BACKGROUND

The following facts are undisputed unless attributed to one party or the other or otherwise specified.

### A. The Stock Purchase and Sale Agreement

Plaintiff Phoenix Van Buren Partners owns a commercial property in Phoenix, Arizona. Beginning in 2006, Phoenix Van Buren leased that property to non-party Smith Moulding Wholesale (an Arizona corporation), for its moulding and custom door shop business.

In early 2008, Defendant Moulding & Millwork — which operated a business similar to that of Smith Moulding, save for the door shop — approached the owners of Smith Moulding, Jerome Smith and Blaine Jarvis, about buying out their interests. In February 2008, Moulding & Millwork reached an agreement with Smith and Jarvis

embodied in a "Stock Purchase and Sale Agreement." (Doc. 12-1 at 34.) Smith Moulding itself was not a party to this agreement. The agreement set up a transaction through which Moulding & Millwork would pay off Smith Moulding's creditors (who had security interests in all or substantially all of Smith Moulding's assets) and also pay cash to Smith and Jarvis (who had personally guaranteed Smith Moulding's liabilities) for their stock.[1]

The lease between Phoenix Van Buren and Smith Moulding prohibited "any change in the ownership of a controlling interest of the voting stock" of Smith Moulding without Phoenix Van Buren's consent. (Doc. 12-1 at 23.) On February 22, 2008, a Smith Moulding officer obtained Phoenix Van Buren's written consent to Moulding & Millwork's proposed purchase "of all the issued and outstanding capital stock of Smith Moulding." (Doc. 18-1 at 12.) Moulding & Millwork was not involved in obtaining this consent, nor did Moulding & Millwork guarantee the lease.

### B. The Closing & Subsequent Events

The transaction between Moulding & Millwork, Smith, and Jarvis closed on February 28, 2008. Moulding & Millwork's parent company then wired approximately $5.4 million directly to Smith Moulding's creditors. Moulding & Millwork characterizes this as "caus[ing] Smith [Moulding] to pay . . . off [the liabilities]" (Doc. 17 at 4), but this is inaccurate. The payoff money went directly from Moulding & Millwork's parent company's account to Smith Moulding's creditors' accounts.[2] Smith and Jarvis then

---

[1] Moulding & Millwork asserts that Smith and Jarvis insisted on a buy-out structure that would minimize their taxable gains while at the same time paying off the Smith Moulding liabilities that Smith and Jarvis had personally guaranteed. According to Moulding & Millwork, Smith and Jarvis believed that a purchase price sufficient to compensate them for the value of their stock *and* to pay off outstanding liabilities would be taxed entirely as profit, so Smith and Jarvis therefore insisted on a stock purchase price exclusive of Smith Moulding's liabilities, with such liabilities to be paid directly by Moulding & Millwork. Phoenix Van Buren disputes these assertions. This dispute is irrelevant given the disposition below.

[2] Moulding & Millwork later terminated the Uniform Commercial Code financing

1  received approximately $2.1 million, and all of their stock in Smith Moulding was
2  transferred to Moulding & Millwork.

3  On its accounting records, Moulding & Millwork booked the $5.4 million creditor
4  payoff as a loan from Moulding & Millwork to Smith Moulding. No documentation for
5  such a loan is in the record. At oral argument, counsel for Moulding & Millwork stated
6  that he was aware of no loan agreement between Smith Moulding and Moulding &
7  Millwork. Moulding & Millwork, however, credited certain Smith Moulding assets
8  (inventory, accounts receivable, equipment, and vehicles) against the loan in the amount
9  of $4.3 million, its view of their value, rather than their book value of $4.7 million.

10  Shortly after closing, Moulding & Millwork closed Smith Moulding's bank
11  accounts, replaced Smith Moulding's officers and directors with persons who were also
12  Moulding & Millwork officers and directors, closed a separate Arizona warehouse from
13  which Moulding & Millwork had been operating, and moved into the premises Smith
14  Moulding was leasing from Phoenix Van Buren. Smith Moulding had no employees of
15  its own after this point.

16  Around this time, Moulding & Millwork sent a letter to its customers under both
17  its own and Smith Moulding's logos displayed side-by-side as follows:

 

22  (Doc. 12-3 at 15.) The letter announced itself to be from "Moulding & Millwork, Inc.,
23  Pacific dba Smith Moulding Wholesale" and informed its recipients that "Smith
24  Wholesale Moulding [*sic*] with Moulding & Millwork are pleased to announce the

---

27  statements of Smith Moulding's largest creditors, and it allowed other financing
   statements related to Smith Moulding's assets to expire.

- 4 -

partnering of the two companies. The Moulding and Millwork branch office and warehouse have been relocated to join the team at Smith Moulding." (*Id.*)

Around the same time, Moulding & Millwork prepared a memorandum for its employees announcing, "With the Smith Wholesale Moulding name being so recognized in the local marketplace we will run our business under this name for the foreseeable future." (Doc. 12-1 at 14.) Moulding & Millwork made this choice in part because it believed it would be easier to sell inventory and collect accounts receivable.

Upon moving into Smith Moulding's facility, Moulding & Millwork added Smith Moulding's inventory to its own and ceased to keep records for Smith Moulding generally, although Moulding & Millwork claims that it kept separate records for Smith Moulding's door shop for a brief time. As Moulding & Millwork sold off inventory, it did not separately track whether that inventory had originally come from Smith Moulding, unless related to the door shop. Moulding & Millwork deposited the proceeds from these sales into its own general operating account. Moulding & Millwork cannot retrospectively account for the proceeds it received from Smith Moulding's inventory, save for inventory items that Moulding & Millwork had not otherwise carried, and for sales made from the door shop for the time when it continued to keep separate records.

As with the inventory, the proceeds from Smith Moulding's vehicles and equipment were deposited into Moulding & Millwork's general operating account.

### C. The Door Shop's Demise

After the purchase, Moulding & Millwork learned that Smith Moulding's door shop was not successful. In August 2008, Moulding & Millwork sent a letter to customers (with its own logo just above Smith Moulding's logo) announcing that the door shop would be shut down. The letter was signed "Smith Moulding & Millwork." (Doc. 12-3 at 62.) Moulding & Millwork then liquidated the door shop's assets and claims to have applied the proceeds against its loan to Smith Moulding.

### D. Smith Moulding's Goodwill and Going Concern Value

As noted above, Moulding & Millwork used Smith Moulding's name (along with its own name) and represented to the public that it was doing business as Smith Moulding. Moulding & Millwork also used Smith Moulding's customer and supplier lists, and took its goodwill. Moulding & Millwork has presented no licensing agreement from Smith Moulding permitting such use (counsel at oral argument was not aware of any such agreement), and it never paid anything to Smith Moulding for use of these assets. It instead claims that these assets became nearly valueless due to the decline in the Phoenix-area home-building economy.

### E. Moulding & Millwork's Abandonment of Phoenix Van Buren's Premises

For about twenty months after acquiring Smith Moulding, Moulding & Millwork used the Phoenix Van Buren property and paid the periodic rents. Moulding & Millwork says that it made these payments on behalf of Smith Moulding. The record contains no sublease agreement between Smith Moulding and Moulding & Millwork, or agreement to assign the lease, and Moulding & Millwork's counsel at oral argument again stated that he was aware of no such agreements. (*Cf.* Doc. 12-1 at 23 (lease provision permitting Smith Moulding to sublet, or assign the lease, to a parent company without Phoenix Van Buren's permission, but requiring the parent company to "assume in writing all of Tenant's obligations under this Lease").) Moulding & Millwork eventually decided the Phoenix Van Buren property was not profitable. It removed all assets and equipment, abandoned the property, and made no further rent payments to Phoenix Van Buren.

### F. Phoenix Van Buren's Lawsuits

After Moulding & Millwork vacated Phoenix Van Buren's premises and stopped paying rent, Phoenix Van Buren sued Smith Moulding in Maricopa County Superior Court for breach of the lease. Geoffrey Hamilton, general manager of special projects at both Moulding & Millwork and Smith Moulding, was Smith Moulding's designated

- 6 -

corporate representative, testifying on Smith Moulding's behalf at the trial. Moulding & Millwork's current counsel represented Smith Moulding in that action.

On July 27, 2011, Phoenix Van Buren obtained a judgment against Smith Moulding for $4,276,246.45 (comprising damages of $4,203,546.00, attorney's fees of $71,636.50, and taxable costs of $1,063.95), plus judgment interest at ten percent per annum. At a judgment debtor's exam, Hamilton once again testified on Smith Moulding's behalf, represented by Moulding & Millwork's current counsel. Because Smith Moulding no longer had any assets, Phoenix Van Buren then filed the current action against Moulding & Millwork to enforce the judgment on theories of fraudulent transfer, alter ego, successor liability, and the trust fund doctrine. Phoenix Van Buren has now moved for summary judgment to establish its causes of action, and Moulding & Millwork has cross-moved to defeat them.

### III. VEIL-PIERCING THROUGH AN ALTER EGO THEORY

#### A. Alter Ego Standard and Application

"[A]lter-ego status is said to exist when there is such unity of interest and ownership that the separate personalities of the corporation and owners cease to exist." *Dietel v. Day*, 16 Ariz. App. 206, 208, 492 P.2d 455, 457 (1972). If the corporation has become the shareholders' alter ego and honoring the separateness between the shareholders and corporation would sanction a fraud or promote injustice, courts will pierce the corporate veil and hold the shareholders responsible for the corporation's liabilities. *Gatecliff v. Great Republic Life Ins. Co.*, 170 Ariz. 34, 37–38, 821 P.2d 725, 728–29 (1991).

In Arizona, alter ego claims comprise two elements: (1) the parent company's substantially total control of the subsidiary, and (2) that honoring the separateness between the parent and subsidiary would sanction a fraud or promote injustice. *Id*. at 37–38, 821 P.2d at 728–29. These elements will be addressed in order, but with an equitable subrogation interlude occasioned by Moulding & Millwork's argument in that regard.

### 1. Substantially Total Control

Moulding & Millwork exercised substantially total control over Smith Moulding. All of Smith Moulding's officers and directors were Moulding & Millwork employees. Moulding & Millwork closed Smith Moulding's bank accounts and transferred its funds into Moulding & Millwork's own accounts. Inventory was intermingled as well, to Moulding & Millwork's sole benefit. Moulding & Millwork appropriated Smith Moulding's goodwill and took to itself the going concern value of Smith Moulding with no pretense of compensation. Moulding & Millwork stripped Smith Moulding of everything to meet the obligations of the business Moulding & Millwork conducted in Smith Moulding's name for Moulding & Millwork's benefit. Moulding & Millwork paid the rent to Phoenix Van Buren as long as it benefited Moulding & Millwork, and paid all of Smith Moulding's other expenses.

Further, none of the foregoing was documented. On its own accounting records, Moulding & Millwork booked its $5.4 million creditor payoff as an intercompany loan, but there is no known loan agreement between the two companies. Moulding & Millwork moved into the space leased by Smith Moulding, but there is no known sublease agreement or written assumption of the lease (as the lease itself required). Moulding & Millwork used Smith Moulding's good will — by using its name and letterhead — but there is no known licensing agreement permitting such use.[3] It kept no

---

[3] Moulding & Millwork claims that Smith Moulding's goodwill had no value. Moulding & Millwork has cited no authority for the proposition that corporate formalities may be disregarded with respect to property that has no value. But in any event, Moulding & Millwork contradicts its own assertion when it says that it continued to use Smith Moulding's name because doing otherwise could harm efforts to collect accounts receivable and sell assets at a fair price. If true, the Smith Moulding name certainly had value. Going concern value is, by definition, the value of the business over and above its liquidation value. *See* Black's Law Dictionary 1587 (8th ed. 2004).

In this same regard, Moulding & Millwork purchased Smith Moulding for $2.1 million more than its outstanding debts, and it asserts that those outstanding debts were undersecured by Smith Moulding's assets. This again suggests that Smith Moulding had value above its liquidation value, even if that value declined due to the collapse of the

separate books or records for Smith Moulding, save for a limited time with respect to the door shop. In sum, it operated Smith Moulding in name only, otherwise absorbing all of Smith Moulding into itself without regard for its separate existence.

This set of facts easily satisfies the substantially total control test. As noted in *Gatecliff*,

> Substantially total control may be proved by showing, among other things: stock ownership by the parent; common officers or directors; financing of subsidiary by the parent; payment of salaries and other expenses of subsidiary by the parent; failure of subsidiary to maintain formalities of separate corporate existence; similarity of logo; and plaintiff's lack of knowledge of subsidiary's separate corporate existence.

*Gatecliff*, 170 Ariz. at 37, 821 P.2d at 728. All of these factors have been established beyond genuine dispute, save for the last two — but five of seven was good enough in *Gatecliff*, *see id.*, as it is here.

Moulding & Millwork challenges to these factors are without merit. Regarding "financing of subsidiary by the parent" and "payment of salaries and other expenses of subsidiary by the parent," Moulding & Millwork claims that Phoenix Van Buren "alleges the exact opposite . . . , not that [Moulding & Millwork] financed and paid salaries and expenses of Smith [Moulding], but that money and assets flowed the other way, from Smith [Moulding] to [Moulding & Millwork] for no consideration." (Doc. 17 at 8.) This argument makes little sense on its own terms, and on the facts of the case. Phoenix Van Buren indeed believes that "money and assets flowed the other way" — all of Smith Moulding's money and assets, leaving it with nothing. Only Moulding & Millwork could cover Smith Moulding's ongoing expenses.

Concerning the same factors, Moulding & Millwork argues that "loans to Smith [Moulding] after the transaction . . . do[] not make the two companies alter egos of one another." (*Id.*) But the record discloses no loans to Smith Moulding after the transaction.

Phoenix-area construction industry.

The record discloses only one arguable loan, *i.e.*, the $5.4 million creditor payoff, booked by Moulding & Millwork after closing as a loan to Smith Moulding. To the extent Moulding & Millwork now implies that its payment of Smith Moulding's ongoing expenses amounted to additional loans, that argument is forfeited. In any event, a properly developed record of such loans would not avoid the third factor. Such loans would have been necessary because Smith Moulding had no money of its own to meet "normal obligations forseeable [*sic*] in a business of its size and character." *Wash. Nat'l Corp. v. Thomas*, 117 Ariz. 95, 101, 570 P.2d 1268, 1274 (Ct. App. 1977) (internal quotation marks omitted), *disapproved on others grounds in Greenfield v. Cheek*, 122 Ariz. 57, 593 P.2d 280 (1979). In other words, under these circumstances, loans to Smith Moulding after the February 2008 transaction would likely establish rather than refute the third factor.

Finally, as to the "formalities of separate corporate existence," Moulding & Millwork has only one response: "Smith [Moulding] is an Arizona corporation — [Moulding & Millwork] is a Washington corporation." (Doc. 17 at 8.) The irrelevance of this assertion is apparent on its face. Accordingly, considering all of the factors, Moulding & Millwork exercised "substantially total control" over Smith Moulding.

### 2. Equitable Subrogation
#### a. Summary of Argument

Moulding & Millwork does not dispute that it mingled Smith Moulding's inventory with its own indiscriminately, and likewise mingled the funds obtained from that inventory with its own. It does not dispute using Smith Moulding's name and paying all of Smith Moulding's expenses. It also does not dispute that Smith Moulding neglected most — perhaps all — corporate formalities while under Moulding & Millwork's control.

Moulding & Millwork's only real counterargument is that it was entitled to do as it pleased with Smith Moulding's assets under the doctrine of equitable subrogation. "Subrogation is the substitution of another person in the place of a creditor, so that the

1 person in whose favor it is exercised succeeds to the rights of the creditor in relation to
2 the debt." *Mosher v. Conway*, 45 Ariz. 463, 468, 46 P.2d 110, 112 (1935).  Moulding &
3 Millwork argues that its $5.4 million creditor payoff loan subrogated it to the rights of
4 Smith Moulding's secured creditors (who had security interests in all or nearly all of
5 Smith Moulding's assets), thus entitling Moulding & Millwork to treat Smith Moulding's
6 assets as collateral for the loan and to satisfy the loan through the value realized from the
7 collateral.

### b.     Lack of Analogous Authority

The Court has located no equitable subrogation case similar to the situation presented in this action.  Equitable subrogation typically involves a claim to property that still exists.  *See*, *e.g.*, *Mosher*, *supra*; *Sun Valley Fin. Servs. of Phoenix, L.L.C. v. Guzman*, 212 Ariz. 495, 134 P.3d 400 (Ct. App. 2006); *Lamb Excavation, Inc. v. Chase Manhattan Mortg. Corp.*, 208 Ariz. 478, 95 P.3d 542 (Ct. App. 2004); *Del E. Webb Hotel Co. v. Bentley*, 8 Ariz. App. 408, 446 P.2d 687 (1968).  The property over which Moulding & Millwork claims an equitably subrogated interest no longer exists.  Moulding & Millwork liquidated it and seeks to justify such liquidation after the fact.  In other words, Moulding & Millwork treats equitable subrogation as a matter of right once one has paid another's debt.  However, equitable subrogation "is not a matter of absolute right but rather, a matter of grace to be granted or withheld as the equities of the case may demand."  *Del E. Webb*, 8 Ariz. App. at 411, 446 P.2d at 690 (internal quotation marks removed; alterations incorporated).  "Whether it is applicable or not depends upon the *particular facts and circumstances of each case as it arises*."  *Mosher*, 45 Ariz. at 468, 46 P.2d at 112 (emphasis added).

Moulding & Millwork leans heavily on a recent Arizona Court of Appeals case, *Sourcecorp, Inc. v. Norcutt*, ___ Ariz. ___, 258 P.3d 281 (Ct. App. 2011).  In *Sourcecorp*, the Norcutts paid cash to buy a home from a third party, the Shill family, and in the process paid off the Shills' debt on that home.  Unfortunately, the Norcutts' title company overlooked Sourcecorp's judgment lien on the home.  Sourcecorp soon initiated sheriff's

- 11 -

1 sale proceedings and the Norcutts moved to quash the execution writ on various theories. One such theory was equitable subrogation — *i.e.*, that when the Norcutts paid off the Shills' debt, they succeeded to the Shills' creditor's first-position lien, ahead of Sourcecorp's judgment lien.

The trial court rejected this argument because it would mean that the Norcutts would "hold a lien on their own house." *Id*. ¶ 9, 258 P.3d at 283 (quoting trial court's order). The Court of Appeals, however, accepted the argument, reasoning that under the circumstances there was no reason that an equitable doctrine like equitable subrogation should not allow the Norcutts to step into the shoes of the Shills' prior creditor. *Id.* ¶¶ 33–36, 258 P.3d at 288–89. The Court of Appeals was substantially influenced by the unique and irreplaceable nature of real estate. *Id.* ¶ 35, 258 P.3d at 289 (reasoning that the Norcutts' obvious remedy in damages against their title company could not make up for losing the home they wanted).

On the morning of oral argument in this action, the Arizona Supreme Court affirmed *Sourcecorp*, but on slightly different grounds. *Sourcecorp, Inc. v Norcutt*, ___ Ariz. ___, ___ P.2d ___, 2012 WL 1138251 (Ariz. Apr. 6, 2012), *slip opinion available at* http://www.azcourts.gov/Portals/23/pdf2012/CV110269PR.pdf. Rather than focusing on the unique nature of real estate, the Supreme Court noted that refusing equitable subrogation would result in a windfall to Sourcecorp because it only moved into first position through a mistake (*i.e.*, assuming that the Norcutts never would have bought the home and paid off the first position lien but for the title company's failure to find the judgment lien). *Id*. ¶¶ 23–24. However, addressing the unfair possibilities inherent in giving an owner a lien on his or her own property, the Supreme Court affirmed that "equitable subrogation depends on the facts of the particular case" and held that, as to the Norcutts, it was "not appropriate to confer on [them] a right to 'foreclose' on the interest to which they are subrogated." *Id*. ¶ 29. Thus, the Norcutts had first position to the extent they could prevent Sourcecorp from foreclosing, but they could not themselves foreclose.

- 12 -

Although a narrow expansion of equitable subrogation, *Sourcecorp* is nonetheless similar to other equitable subrogation cases to the extent it resolves claims to still-existing property. That is not this case.

Moulding & Millwork nonetheless believes that *Sourcecorp* justifies its course of action here, analogizing itself to the Norcutts, who ended up owning both the property and a lien on that property. But even on that account, Moulding & Millwork misses a crucial distinction: Moulding & Millwork did not own the property. Moulding & Millwork bought Smith Moulding's stock, not its assets. "It is elementary that a corporation is for most purposes an entity distinct from its individual members or stockholders. By the very nature of a corporation the corporate property is vested in the corporation itself and not in the stockholders." *Corp. Comm'n v. Consolidated Stage Co.*, 63 Ariz. 257, 259, 161 P.2d 110, 111 (1945); *see also* 1 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 31 (perm. ed.) ("The property of the corporation is its property and not that of the shareholders as owners, even if there is only one shareholder . . . ." (footnote omitted)) ("*Fletcher Cyclopedia*"). Further, as the Arizona Supreme Court demonstrated in affirming *Sourcecorp*, even if Moulding & Millwork had managed to obtain both possession of and a lien on those assets, it would not be automatically entitled to foreclose. It would instead depend on the facts of the particular case. Accordingly, the Court could find no case discussing (much less permitting) equitable subrogation in circumstances similar to those here.

          **c.**    **Lack of Equitable Justification for Subrogation**

Even if Moulding & Millwork could theoretically qualify for equitable subrogation, equity would not authorize it on the facts of this particular case. First, Moulding & Millwork has already disposed of the property at issue, thus leaving the Court with no interests to adjust other than who pays whom. Second, Moulding & Millwork disposed of the property without telling Phoenix Van Buren that it was emptying Smith Moulding of all ability to operate as a going concern on its own. Third, Moulding & Millwork took the benefits of the lease for as long as was convenient and

then abandoned the property, thus displaying unclean hands. In these circumstances, equitable subrogation is not justified.

### d. Additional Failure to Respect Corporate Separateness

Moulding & Millwork's claim of equitable subrogation to the position of Smith Moulding's secured creditors fails as a matter of law. But even if equitable subrogation applied from the closing of the February 2008 transaction, Moulding & Millwork's undisputed conduct thereafter further proves Phoenix Van Buren's claims for piercing Smith Moulding's corporate veil to reach Moulding & Millwork.

Moulding & Millwork says that it "received certain Smith [Moulding] assets or proceeds from the disposition of [such] assets" as in-kind partial satisfaction of the $5.4 million loan that supposedly subrogated it to the secured creditors' rights. (Doc. 17 at 4.) If true, such in-kind satisfaction could only have happened in one of two ways. First, Moulding & Millwork could have foreclosed on prior creditors' security interests, bid in the debt, and seized the assets. Moulding & Millwork makes no argument that it pursued this approach. In fact, it did the opposite: it terminated the relevant financing statements or allowed them to expire. At that point, the property subject to the financing statements was unquestionably Smith Moulding's, free and clear — not Moulding & Millwork's.

The second method through which Moulding & Millwork could have obtained in-kind satisfaction would have been for Smith Moulding to agree to transfer its assets as payment on the debt. Moulding & Millwork's briefs invite the reader to assume that Smith Moulding took this course of action, but Moulding & Millwork does not actually say that Smith Moulding made this choice, it submits no evidence showing that such a choice was made, and counsel at oral argument knew of none. For instance, Moulding & Millwork fails to provide documentation of the procedures Smith Moulding would be required to follow if it had agreed to surrender all of its assets to Moulding & Millwork. An Arizona corporation may not "dispose of all or substantially all of its property . . . other than in the usual and regular course of business" without a proposal from the board of directors and shareholder approval. A.R.S. § 10-1202(A)–(B). Moulding & Millwork

has submitted no evidence suggesting that Smith Moulding observed this requirement. And even if it did not apply, prudence would demand some sort of documentation — from both Smith Moulding and Moulding & Millwork — memorializing an agreement to exchange $4 million in assets (supposedly all of Smith Moulding's assets) for credit against a debt. Moulding & Millwork has submitted no such documentation.

Moulding & Millwork simply seized Smith Moulding's assets, which would not be permissible for any secured creditor. Thus, even if equitably subrogated to Smith Moulding's prior creditors' security interests, Moulding & Millwork's failure to behave like a secured creditor further evinces the lack of respect for the separateness between itself and its subsidiary.

### 3.سanctioning a Fraud or Promoting Injustice

Phoenix Van Buren has established a lack of genuine dispute regarding the "substantially total control" element of the veil-piercing analysis. To prevail fully at this summary judgment stage, Phoenix Van Buren must also establish that honoring the separateness between the parent and subsidiary would sanction a fraud or promote injustice. *Gatecliff*, 170 Ariz. at 37–38, 821 P.2d at 728–29. The analysis here is similar to the equitable reasons for denying subrogation. Specifically, refusing to pierce the corporate veil in this case would promote injustice by permitting Moulding & Millwork to take the benefits of the lease (premises from which to do business, along with whatever advantages it may have gained from doing business in that specific location) without its corresponding burdens (the remedies provided to Phoenix Van Buren against a tenant who abandons the lease). Moreover, when Phoenix Van Buren consented to Moulding & Millwork's takeover, it was not informed that the transfer "of all the issued and outstanding capital stock of Smith Moulding" (Doc. 18-1 at 12) would also involve an intercompany loan to be satisfied in-kind through all Smith Moulding assets, leaving it with nothing. Had Phoenix Van Buren known how Moulding & Millwork planned to operate Smith Moulding, it very likely would not have consented to the change in control.

Moulding & Millwork cannot, in such circumstances, keep the limited liability benefit of the corporate form.

In opposition, however, Moulding & Millwork claims:

> [Phoenix Van Buren] is in no worse position now than it would have been if [Moulding & Millwork] had not appeared on the scene. In fact, [Phoenix Van Buren] is better off as a result of the transaction. As of the closing, Smith [Moulding] owed [Phoenix Van Buren] $33,635.03 in past due rent, which was paid with [Moulding & Millwork]'s funds. After the closing, [Moulding & Millwork] funded additional rent payments on behalf of Smith [Moulding] totaling $1,053,360. If the transaction had not occurred, Smith [Moulding] would have defaulted on the lease long before it eventually did. [Phoenix Van Buren] would not have had any claim against the prior owners, as shareholders, or against the encumbered assets of Smith [Moulding] pledged to secured creditors.

(Doc. 17 at 16 (citations omitted).) Even if relevant, the argument is misdirected because it focuses entirely on the immediate effect of February 2008 takeover, rather than abandonment of the lease months later. One can assume that Moulding & Millwork's takeover of Smith Moulding benefited Phoenix Van Buren for the months in which Moulding & Millwork continued to pay the rent. But the fact remains that Moulding & Millwork eventually stopped paying the rent, after having emptied Smith Moulding of all ability to do so on its own. Benefitting from corporate separateness at that point, after having disregarded it since the takeover, would be unjust.

In addition, there is no evidence in the record that "Smith [Moulding] would have defaulted on the lease long before it eventually did." It is only speculation. If Smith Moulding was indeed going under before Moulding & Millwork arrived, it may have defaulted, or it may have renegotiated the lease, or it may have found a sublessor, or any number of other possibilities. But no evidence purports to establish that Smith Moulding would have failed absent Moulding & Millwork's intervention. Nor has Moulding & Millwork cited any authority establishing the relevance of this consideration. As

noted, saving Smith Moulding from collapsing in February 2008 does not excuse Moulding & Millwork's subsequent conduct.

Finally, it is also no defense that Moulding & Millwork may have been able to put Phoenix Van Buren in the same position lawfully (*e.g.*, by observing the necessary formalities to document the $5.4 million loan, causing Smith Moulding's board to resolve to transfer all of its assets to Moulding & Millwork in satisfaction of that loan, and so forth). In every veil-piercing case, the plaintiff would be left without a meaningful remedy had the shareholder respected the separateness of the corporate form.

Phoenix Van Buren has established that observing the corporate form would sanction a fraud or promote injustice. Accordingly, Phoenix Van Buren has satisfied both elements of the alter ego test. *See Gatecliff*, 170 Ariz. at 37–38, 821 P.2d at 728–29.

### B. Whether Fact Issues Remain

Moulding & Millwork argues that, even if liable on an alter ego theory, fact issues remain that preclude summary judgment. Specifically: "If [Phoenix Van Buren] had a breach of lease claim against [Moulding & Millwork], it should have asserted it. If that is the case, then [Moulding & Millwork] should be afforded the opportunity to present all defenses to that claim, including but not limited to the duty to mitigate damages, not simply accept a number derived in a separate litigation against Smith [Moulding]." (Doc. 17 at 16–17.)

Moulding & Millwork mischaracterizes the issue. Establishing lack of corporate separateness is a different inquiry than breach of the lease. Successfully holding a shareholder liable for the corporation's acts does not give the shareholder the right to relitigate the underlying case against the corporation. *Cf.* 1 *Fletcher Cyclopedia* § 41.10 ("A finding of fact of alter ego . . . furnishes a means for a complainant to reach a second corporation or individual upon a cause of action that otherwise would have existed only against the first corporation. An attempt to pierce the corporate veil is a means of imposing liability on an underlying cause of action such as a tort or breach of contract." (footnotes omitted)).

In any event, a claim preclusion or issue preclusion analysis would lead to the same result. This Court must give the Superior Court judgment "the same full faith and credit . . . as [it has] by Law or usage in the courts of [Arizona]." 28 U.S.C. § 1738. Arizona follows the *Restatement (Second) of Judgments* § 39 on this issue. *See Indus. Park Corp. v. U.S.I.F. Palo Verde Corp.*, 26 Ariz. App. 204, 209, 547 P.2d 56, 61 (1976) (citing with approval *Restatement (Second) of Judgments* § 83 (Tent. Draft No. 2, 1975), which was eventually codified at § 39). According to the *Restatement*, "A person who is not a party to an action but who controls or substantially participates in the control of the presentation on behalf of a party is bound by the determination of issues decided as though he were a party." *Restatement (Second) of Judgments* § 39 (1982).

> To have control of litigation requires that a person have effective choice as to the legal theories and proofs to be advanced in behalf of the party to the action. . . . Whether his involvement in the action is extensive enough to constitute control is a question of fact, to be resolved with reference to these criteria. It is sufficient that the choices were in the hands of counsel responsible to the controlling person; moreover, the requisite opportunity may exist even when it is shared with other persons. It is not sufficient, however, that the person merely contributed funds or advice in support of the party, supplied counsel to the party, or appeared as amicus curiae.

*Id*. cmt. c.

The evidence already considered suffices to answer this question. As a matter of common sense, a shareholder that disregards corporate separateness is *per se* in control of the corporation and its litigation and therefore bound as though a party. Even if this were not the case, it is beyond dispute here that Moulding & Millwork in fact controlled Smith Moulding's litigation. Smith Moulding could do nothing except as animated by Moulding & Millwork because Smith Moulding had no employees of its own, or money. Geoffrey Hamilton took the title of general manager of special projects at Smith Moulding — the same title he held at Moulding & Millwork — and acted as Smith

Moulding's representative in the Superior Court action, with Moulding & Millwork's current counsel representing Smith Moulding. If Smith Moulding did not, at that time, present defenses such as mitigation, Moulding & Millwork can blame only itself.

Phoenix Van Buren's motion for summary judgment will be granted, and Moulding & Millwork's cross-motion denied, on Phoenix Van Buren's alter ego cause of action.

## IV.  REMAINING ISSUES

Phoenix Van Buren's success on its alter ego claim makes consideration of its other theories unnecessary. None of those other theories could afford more relief than piercing the corporate veil. Thus, the Court does not address whether either side has proved or disproved Phoenix Van Buren's fraudulent transfer, successor liability, and trust fund theories.

## V.  FORM OF JUDGMENT

Having operated Smith Moulding as an alter ego, the judgment against Moulding & Millwork should be the same as the judgment Phoenix Van Buren obtained in the Superior Court. *See* 1 *Fletcher Cyclopedia* § 41.10. However, the issue of post-judgment interest requires some discussion. Before July 20, 2011, the Arizona statutory judgment rate was ten percent per annum. A.R.S. § 44-1201(A) (2003 & Supp. 2010). Since that date, the judgment rate is prime-plus-one-percent. 2011 Ariz. Sess. Laws., ch. 99 § 15. Phoenix Van Buren obtained its judgment on July 27, 2011. It therefore should have received prime-plus-one-percent on the principal judgment. It instead received ten percent.

At oral argument, counsel for Phoenix Van Buren clarified that he had submitted a form of judgment before the interest rate change took effect, but the Superior Court did not act on it until after the change. When the Superior Court did act, it approved the form of judgment without modification.

At oral argument, counsel for both sides agreed, under the authority of *McBride v. Superior Court*, 130 Ariz. 193, 635 P.2d 178 (1981), that the new interest rate controls

1  regardless of the mistake.  Counsel for Phoenix Van Buren represented that the
2  appropriate interest rate on July 27, 2011 was 4.25 percent, and counsel for Moulding &
3  Millwork accepted that representation.  The judgment will therefore bear that interest
4  rate.

    IT IS THEREFORE ORDERED that Plaintiff's motion for summary judgment (Doc. 11) is GRANTED with respect to Plaintiff's second cause of action (alter ego) and DENIED in all other respects as moot.

    IT IS FURTHER ORDERED that Defendant's cross-motion for summary judgment (Doc. 17) is DENIED with respect to Plaintiff's second cause of action (alter ego) and DENIED in all other respects as moot.

    IT IS FURTHER ORDERED that the Clerk shall enter judgment in favor of Plaintiff and against Defendant in the amount of $4,276,246.45, with post-judgment interest accruing at 4.25 percent per annum from July 27, 2011 until paid in full.  The judgment shall also contain this sentence: "This judgment is concurrent with, and not cumulative to, the July 27, 2011 judgment entered by the Maricopa County Superior Court in civil case number 2009-037646."  The Clerk shall terminate this case.

    Dated this 10th day of April, 2012.

_____
Neil V. Wake
United States District Judge